UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

AMERICAN COPPER & BRASS, INC., a
Michigan corporation, individually and as
the representative of a class of similarly
situated persons,

        Plaintiff,

v.

LAKE CITY INDUSTRIAL PRODUCTS,
INC., and JEFFREY MEEDER,

        Defendants.
                               /

Case No. 1:09-CV-1162

HON. GORDON J. QUIST

## MEMORANDUM OPINION GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

    Plaintiff, American Copper & Brass, Inc., on behalf of itself and a class of similarly situated persons, has sued Defendants, Lake City Industrial Products and Jeffrey Meeder, alleging that they violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. American Copper alleges that Defendants violated the TCPA when Business To Business Solutions ("B2B")—a company that advertised for clients by sending out mass fax broadcasts—sent out a mass fax broadcast advertising a Lake City product. American Copper received one of more than 10,000 faxes sent. This Court has previously denied Meeder's Motion for Summary Judgment (docket no. 67). American Copper has now moved for summary judgment (docket no. 199). For the reasons set forth below, the Court will grant the motion.

### I. BACKGROUND

    The facts are largely undisputed. This Court previously set out the pertinent facts as follows,

> Caroline Abraham owned and operated [B2B], a company that advertised for clients by sending out mass fax broadcasts. Caroline Abraham's son, Joel Abraham, helped operate B2B. B2B obtained clients in the first place by sending out mass fax broadcasts. B2B's faxes soliciting business stated that B2B's advertising "Conforms to February, 2006 Faxing Guidelines." (Docket no. 55-3 at 2.) B2B sent a fax to Lake City soliciting Lake City as a client. Lake City inquired into B2B's services and, after a purported agent of B2B allegedly told Lake City president, co-Defendant Jeffrey Meeder, that B2B's services were legal, Lake City decided to enlist B2B's services. B2B helped Lake City draft its advertisement by having Defendants fill out a questionnaire regarding Lake City's business. In addition, B2B created a list of targets—a certain geographic location or a particular category of business that would receive Lake City's advertisement. B2B told clients that it would fax their advertisement to 10,000 targets. B2B performed these services for about $92. Eventually, without permission or invitation from any target, B2B sent the advertisement via fax to the targeted businesses.[1]
>
> On or around February 20, 2006, one of the faxes was sent to American Copper. (Compl. Ex. A.) American Copper did not request to receive the fax or give Lake City or B2B permission to send the fax. American Copper filed its claim on December 29, 2009.

(Opinion, Docket no. 82, Page ID 1714.) Meeder has conceded that he acted on behalf of Lake City in dealing with B2B by: (1) responding to the fax B2B sent to Lake City advertising B2B's fax services; (2) purchasing two Voice over Internet Protocol (VoIP) lines; (3) completing the questionnaire furnished by B2B, from which B2B prepared a draft fax advertising a Lake City product; and (4) reviewing, revising, and approving the draft fax that B2B ultimately sent. (Mem. Opinion, Docket no. 85, Page ID 1736 (citing Defs.' Br. at 3–4).)

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). The burden to show that there is no genuine issue of material fact falls upon

---

[1] Defendants dispute, however, how many of the targets actually received the faxes.

the party seeking summary judgment. *Id.* In evaluating the evidence, a court must draw all reasonable inferences in favor of the non-moving party. *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Once a moving party produces evidence establishing lack of a genuine issue of material fact, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* The "mere existence of a scintilla of evidence" in support of a plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson,* 477 U.S. at 252, 106 S. Ct. at 2512.

### III.  DISCUSSION

The TCPA prohibits "any person within the United States, or any person outside the United States if the recipient is within the United States" from "us[ing] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless the sender has an established business relationship with the recipient, the sender obtained prior permission to send the unsolicited advertisement or the recipient agreed to make its fax number available for public distribution, and the unsolicited advertisement contains the requisite notice. 47 U.S.C. § 227(b)(1)(C). The statute authorizes $500.00 in statutory damages for each unsolicited fax advertisement. *Id.* at § 227(b)(3); *see also Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 491 (7th Cir. 2013). If a court finds that a defendant "willfully or knowingly" violated the statute or the pertinent regulations, a court may, in its discretion, treble the damages. 47 U.S.C. § 227(b)(3).

In opposition to summary judgment, Defendants make three arguments: (1) Defendants are not liable for B2B's broadcast fax because the statute does not impose strict liability, (2) questions

3

of fact remain as to whether the faxes were actually received by class members, and (3) summary judgment would lead to Lake City's bankruptcy.

### 1. Strict Liability

Defendants first argue that they are not liable because the TCPA does not impose strict liability. Specifically, Defendants contend that because B2B created the fax, sent it to a list of numbers generated by B2B, and B2B owned and operated the VoIP lines, summary judgment is improper under the TCPA. Defendants' argument is unpersuasive.

"The TCPA is essentially a strict liability statute," which imposes liability upon senders of unsolicited faxes. *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011) (citing *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008)); *see also Machesney v. Lar-Bev of Howell, Inc.*, No. 10-10085, 2013 WL 1721150, at *1 (E.D. Mich. Apr. 22, 2013); *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1318 (S.D. Fla. 2012); *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 314 F. Supp. 2d 1094, 1103 (D. Kan. 2004). "That is, the statute does not require any intent on the part of the sender for liability, except when awarding treble damages." *Machesney*, 2013 WL 1721150, at *1 (citing *Alea*, 638 F.3d at 776). The relevant Federal Communications Commission (FCC) regulations define a "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10); *see also In Re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 F.C.C.R. 12391, 12407–08 (1995) (clarifying that "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements"). A defendant "cannot escape liability simply by hiring an independent contractor to transmit unsolicited facsimiles on their behalf." *Bridgeview Health Care Ctr., Ltd. v. Clark*, No. 09-CV005601, 2011 WL 4585028, at *4 (N.D. Ill. Sept. 30, 2011).

In this case, Defendants argue that B2B was solely responsible for sending the broadcast fax. However, Meeder has conceded that, in his capacity as a representative of Lake City, he responded to B2B's advertisement; purchased VoIP lines; completed a questionnaire about Lake City for B2B to use to design a fax advertising a Lake City product; and he reviewed a draft fax, revised it, and approved it for sending by fax machine to approximately 10,000 targeted fax numbers.  It is undisputed that Meeder first asked B2B whether its practices were legal, and when a purported B2B representative answered in the affirmative, Meeder accepted the response as true.[2]

In support of its argument that the TCPA is not a strict liability statute, Defendants cite *Mey v. Pinnacle Security, LLC*, No. 5:11CV47, 2012 WL 4009718 (N.D. W.Va. Sept. 12, 2012).  In *Mey*, the plaintiff brought an action against the defendant for making automated telemarketing calls. However, because the calls were actually placed by independent third-party "lead generators," and the defendant produced evidence that the defendant only made live calls and had no control over how third-party lead generators made their calls, the court granted summary judgment in favor of the defendant. *Id.* at *3–*6.  The court reasoned that § 227(b)(3) does not require "strict 'on behalf of' liability."[3]  *Id.* at *4.  Nonetheless, although the *Mey* court declined to impose strict liability, it held that defendants may be held vicariously liable under the TCPA.  *Id.* (citing *Meyer v. Holley*, 537 U.S. 280, 285, 123 S. Ct. 824, 828 (2003) ("[W]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules.")).  Vicarious liability turns on a defendant's degree of control over the manner and means of the calls placed (or facsimiles sent) on behalf of a defendant.

---

[2] Based upon the parties' briefs, it appears that Meeder and Lake City are bigger victims of fraud or negligence (for not consulting a lawyer) than any individual member of the class.

[3] The court's reasoning is unpersuasive.  The statute's plain language allows for statutory damages for each violation, but, if the violation is *willfully or knowingly* committed, a court may impose treble damages.  Thus, on its face, a violation of the statute, as it sets forth statutory damages of $500, does not require a willful or knowing violation.

*Id.* (citing *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084–85 (C.D. Cal. 2012)). However, because the *Mey* plaintiff had failed to create an issue of material fact regarding the defendant's ability to control the calls of third-party lead generators, the court granted summary judgment in favor of the defendant. *Id.* at *5.

Even if this Court were to hold that the TCPA does not impose strict liability, Defendants would be vicariously liable for B2B's broadcast fax because the instant case is factually distinguishable from *Mey*. Unlike the defendant in *Mey*, Meeder, in his capacity as a representative of Lake City, responded to B2B's advertisement, paid for VoIP lines, completed a questionnaire, and edited and approved a fax that he knew would be sent to approximately 10,000 target fax numbers of businesses that had not solicited Meeder. Although Meeder was unaware of exactly how the numbers were generated, he had significantly more knowledge of the proposed broadcast fax and control over whether to execute the fax than the *Mey* defendant. In *Mey*, the defendant was wholly unaware that a third-party lead generator was placing automated calls advertising the defendant's products, and the plaintiff lacked evidence that the defendant had control over the means, method, or manner of executing the calls.

## 2. Number of Faxes Received

Next, Defendants argue that Plaintiff cannot prove how many faxes were actually sent because the only procedure to verify that a fax was actually sent is to print it on paper. (Defs.' Resp., Docket no. 204, Page ID 2655.) Therefore, because Plaintiff has not introduced a paper copy of each fax sent, Defendant argues that a substantial question of fact exists as to whether over 10,000 faxes were "actually received." (*Id.*)

The TCPA prohibits the use of "any telephone facsimile machine, computer, or other device, to *send*, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C)

(emphasis added). The TCPA defines "telephone facsimile machine" as "equipment which has the *capacity* (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." *Id.* at § 227(a)(3) (emphasis added). The TCPA does not require that a fax be received and physically printed in order to fall within its scope. The statutory text merely requires that a defendant "send" the fax and that the fax equipment be capable of transcribing text or images. *See, e.g.*, *A Fast Sign Company, Inc. v. Am. Home Servs., Inc.*, 291 Ga. 844, 846–47, 734 S.E.2d 31, 33 (Ga. 2012) (finding a lower court "erred when it determined that only the receipt of an unsolicited fax created an actionable violation of the TCPA"); *Critchfield v. Taranto Grp., Inc.*, 293 Kan. 285, 298, 263 P.3d 767, 778 (Kan. 2011) ("The statute creates no requirement that a transmission be received."); *Hinman v. M and M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152, 1159 (N.D. Ill. 2009) (holding the defendant could not avoid summary judgment on the basis of "false positives" and observing that "the FCC has specifically rejected the argument . . . that faxes received by networked fax machines []which allow recipients to view and discard unwanted faxes prior to printing them[] are beyond the reach of the statute) (citing 18 F.C.C.R. at 14133).

In support of their argument, Defendants offer an expert report from James (Ray) Horak, which identifies possible errors in sending faxes between qualifying machines. Horak also opines that a significant percentage of the faxes at issue in this case would not qualify as a telephone facsimile machine as defined in the TCPA.

Regarding possible transmission errors, Horak's opinion is unpersuasive for several reasons. First, the TCPA does not require that a fax transmission be received, only that it be sent. 47 U.S.C. § 227(b)(1)(C); *see also Hinman*, 596 F. Supp. 2d at 1159 ("On its face, the statute prohibit[s] the

7

sending of unsolicited fax advertisements and make[s] no reference at all to receipt, much less to printing."). As such, courts have held that "plaintiffs need not identify which specific fax numbers successfully received defendants' transmission from a list of numbers to which the transmission was indisputably sent." *Saf-T-Gard Int'l, Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312, 315 (N.D. Ill. 2008); *see also Clearbrook v. Rooflifter, LLC*, No. 08 C 3276, 2010 WL 2635781, at *3 (N.D. Ill. 2010). Second, Horak's analysis is speculative at best: he does not cite specific instances in which a B2B transmission was falsely listed on a transmission record as "sent," but only cites technical errors that may cause unsuccessful attempts at transmission. To the contrary, there is strong evidence that the fax transmission logs are accurate, and any unsuccessful transmission attempts have already been removed. (*See* Ex. A, Biggerstaff Second Expert Report, Docket no. 22, Page ID 2575–2579.) The evidence shows that the broadcast fax was "sent" to over 10,000 fax numbers, and there is no evidence to support that those faxes were not "sent" for TCPA purposes.

Regarding Horak's opinion about which devices fall within the scope of the TCPA, the Court agrees that "this is a potentially complicated issue, since the TCPA does not define the term 'regular telephone line,' and cases and other authorities are silent on the question," *CE Design Ltd. v. King Architectural Metals, Inc.*, 271 F.R.D. 595, 602 (N.D. Ill. 2010), *vacated on other grounds by* 637 F.3d 721 (7th Cir. 2011). Indeed, although unsolicited faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers do fall within the TCPA's prohibitions, "that prohibition does not extend to facsimile messages sent as email over the Internet." 18 F.C.C.R. at 14133. However, "a conventional stand-alone telephone facsimile machine is just one device used . . . developing technologies permit one to send and receive facsimile messages in a myriad of ways . . . . The TCPA's definition of 'telephone facsimile machine' broadly applies to any equipment that has the capacity to send or receive text or images.

The purpose of the requirement that a 'telephone facsimile machine' have the 'capacity to transcribe text or images' is to ensure that the prohibition on unsolicited faxing not be circumvented." *Id.*

In this case, the evidence shows that the devices used to send and receive the pertinent broadcast fax fall within the scope of the TCPA. First, Plaintiff has introduced evidence that the fax machines used to send the broadcast fax fall within the scope of the TCPA; Horak has offered only speculation that some other transmission line was used. Specifically, Plaintiff has offered evidence that B2B used regular T1 fax lines for sending customer faxes, including the pertinent fax in this case, rather than VoIP lines because the VoIP lines had a low transmission rate and were better used for voice calls than faxes. (Caroline Abraham Dep., Ex. D, Docket no. 200, Page ID 2371, 2377, 2382.)

Second, Plaintiff's expert witness has opined that it would have been "physically impossible" for B2B's VoIP lines to transmit the number of faxes that B2B sent for Lake City's in the amount of time that it did. (Ex. A, Biggerstaff Second Expert Report, Docket no. 22, Page ID 2580.) It is highly likely that B2B sent the faxes over its 30 T1 fax lines that it normally used for customer advertisements. (*Id.* at 2579–80, 2582.) The corresponding modems used by B2B had the capacity to use, and in fact required, "a standard, analog, 2-wire telephone, land-line connection with a dialtone in order to send a fax," and therefore fall within the definition of a "telephone facsimile machine." (*See id.* at 2581.)

Third, it is clear that fax transmissions sent to email involve a two-step process, whereby a sender first sends a fax by a conventional "T.30" fax transmission between a sending fax machine and a receiving fax machine, and second, a software application repackages and forwards the fax by email. (*Id.* at 2584–85.) The FCC has exempted from the TCPA the act of forwarding a fax by email. 18 F.C.C.R. at 14133. However, the first step—the transmission of the original fax—still

falls within the confines of the TCPA. The legislative history and congressional intent behind the TCPA supports this interpretation. *See* 18 F.C.C.R. at 14133–34. ("[B]ecause a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it.") Defendants do not cite evidence to support a different interpretation. Finally, as discussed above, there is no support for Horak's conclusion that the TCPA requires a device to be connected to a printer or scanner to fall within the definition of "telephone facsimile machine." Rather, the definition merely requires the device to have the "capacity" to transcribe text or images from paper into an electronic signal and transmit it over a regular telephone line, *or* to transcribe a text or image from an electronic signal received over a regular telephone line onto paper. 47 U.S.C. § 227(a)(3) (emphasis added). Thus, as applied to the facts of this case, Defendants' argument is unpersuasive.

### 3. Bankruptcy

Defendants' final argument against summary judgment is that a judgment for Plaintiff would likely bankrupt Lake City. For authority, Defendants cite the Sixth Circuit's opinion denying Defendants' petition for appeal of this Court's Order certifying a class action. *See In re Lake City Indus. Prods., Inc.*, No. 12-0108, 2013 WL 414652, at *1 (6th Cir. Jan. 9, 2013) ("[A]lthough Lake City argues that it is a small, family-owned business that will fold if this suit continues, a party must offer more than a 'general assertion' of harm. Lake City has not quantified its potential expenses or liabilities should the trial proceed, and this case is in its infancy. Although the potential class is large, discovery is not complete and a number of the class members have already opted out of the suit.") Defendants argue that they now face a possible judgment amount of $5,254,500.00, so the Court should consider the financial impact of such a judgment. However, the relevance of the

financial impact on Lake City is limited to whether continued litigation would sound a "death knell," to Lake City, one factor that courts of appeal consider in evaluating a petition to appeal under Federal Rule of Civil Procedure 23(f).  *See* Fed. R. Civ. P. Advisory Committee Note; *In re Delta Air Lines*, 310 F.3d 953, 960 (6th Cir. 2002) ("The 'death knell' factor, as discussed in the [1998 Amendments to the] Advisory Committee Notes and *Blair* [181 F.3d 832 (7th Cir. 1999)], in particular, is a recognition that the costs of continuing litigation for either a plaintiff or defendant may present such a barrier that later review is hampered.") Thus, for purposes of liability at the summary judgment stage, the Court will not consider Defendants' ability to pay a judgment.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant summary judgment in favor of Plaintiff.

A separate order shall issue.


Dated:  July 12, 2013                                  /s/ Gordon J. Quist
                                                            GORDON J. QUIST
                                                     UNITED STATES DISTRICT JUDGE